Gatehouse Media Massachusetts I, Inc. v. The New York Times Co. Doc. 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**GATEHOUSE MEDIA MASSACHUSETTS I, INC.**, DOING BUSINESS AS GATEHOUSE MEDIA NEW ENGLAND,

*Plaintiff,*

*-against-*

**THE NEW YORK TIMES CO.**, DOING BUSINESS AS BOSTON.COM

*Defendant.*

**C.A. No. ____**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF GATEHOUSE MEDIA MASSACHUSETTS I, INC.'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

**HISCOCK & BARCLAY, LLP**
Office and Post Office Address
50 Federal Street – 5th Floor
Boston, Massachusetts 02110-2509
Telephone: (617) 274-2900

Michael J. Grygiel
Anthony A. Scibelli
William A. Hurst
Carolyn A. Marcotte
*of Counsel*

Dockets.Justia.com

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 4

POINT I

THE PRELIMINARY INJUNCTION STANDARD ........ 4

POINT II

GATEHOUSE IS ENTITLED TO EMERGENCY INJUNCTIVE RELIEF BASED ON DEFENDANT'S INFRINGEMENT OF ITS COPYRIGHTS AND TRADEMARKS ........ 5

A. Likelihood of Success on the Merits ........ 5

1. Plaintiff Has Established a *Prima Facie* Case of Copyright Infringement ........ 6

a. Plaintiff Holds the Necessary Copyright Interests. ........ 6

b. Defendant Is a Direct Infringer ........ 8

(1) Violation of GateHouse's Reproduction Right. ........ 9

(2) Violation of GateHouse's Display Right. ........ 10

(3) Violation of GateHouse's Distribution Right. ........ 11

2. Plaintiff's Trademark Claims ........ 12

a. Trademark Infringement and Unfair Competition. ........ 12

b. Plaintiff's Marks *Newton TAB* and *Daily News Tribune* Qualify for Trademark Protection. ........ 13

c. Plaintiff Has Made Out a *Prima Facie* Case of Confusion. ........ 16

B. Irreparable Harm Is Presumed Based on Defendant's Acknowledged Copying of GateHouse's Copyrighted News Content. ........ 18

C. The Balance of Hardships Weighs in Favor of Injunctive Relief. ..... 22

D. The Public Interest Is Served By Upholding Copyright Law Protections ..... 24

POINT III

SCOPE OF THE INJUNCTION SOUGHT ..... 25

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

## FEDERAL CASES

*ASICS Corp. v. Antillas Shoe Corp.*, No. 89-0442, 1989 U.S. Dist. LEXIS 15332 (D.P.R., Apr. 18, 1989) ........ 19

*Action Tapes, Inc. v. Mattson*, 462 F.3d 1010 (8th Cir. 2006) ........ 7

*American Association for the Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244 (D.D.C. 1980) ........ 14

*American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103 (2d Cir. 1978) ........ 13

*American Century Home Fabrics, Inc. v. Ashley Furniture Industries, Inc.*, 473 F. Supp. 2d 168 (D. Mass. 2007) ........ 4

*American Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) ........ 4

*American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994) ........ 9

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3d Cir. 1983) ........ 23

*Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982) ........ 23

*Beacon Mutual Insurance Co. v. OneBeacon Insurance Group*, 376 F.3d 8 (1st Cir. 2004) ........ 16

*Borinquen Biscuit Corp. v. M.V. Trading Corp*, 443 F.3d 112 (1st Cir. 2006) ........ 14

*Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1 (1st Cir. 2008) ........ 12, 13

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995) ........ 9

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986) ........ 18

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........ 20

*Cartoon Network LP v. CSC Holdings, Inc.*, 2008 WL 2952614 (2d Cir. Aug. 4, 2008) ........ 10

*Cipes v. Mikasa, Inc.*, 404 F. Supp. 2d 367 (D. Mass. 2005) ....................24

*Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600 (1st Cir. 1988) ....................4, 5, 18, 22, 23

*Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) ....................6

*Datatel, Inc. v. Rose & Tuck, LLC*, No. 05-495, 2005 U.S. Dist. LEXIS 29704 (E.D. Va., June 17, 2005) ....................7

*Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093 (8th Cir. 1996) ....................14

*Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542 (1st Cir. 1995) ....................13

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991) ....................5

*Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.*, 25 F.3d 119 (2d Cir. 1994) ....................18

*Flomerics Ltd. v. Fluid Dynamics International, Inc.*, 880 F. Supp. 60 (D. Mass, 1995) ....................4, 6, 18

*Foraste v. Brown University*, 248 F. Supp. 2d 71 (D.R.I. 2003) ....................7

*Friendly Publications, Inc. v. Creative Handbook Services, Inc.*, No. 79 Civ. 2758, 1979 U.S. Dist. LEXIS 8982 (S.D.N.Y. Oct. 24, 1979) ....................19

*Gable-Leigh, Inc. v. North American Miss.*, No. 01-01019, 2001 U.S. Dist. LEXIS 25614 (C.D. Cal. April 9, 2001) ....................7

*Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002) ....................10

*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994) ....................21

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ....................5

*Havens v. Time Warner, Inc.*, 896 F. Supp. 141 (S.D.N.Y. 1995) ....................7

*Iconbazaar L.L.C. v. America Online, Inc.*, 308 F. Supp. 2d 630 (M.D.N.C. 2004) ....................7

*International Association of Machinists & Aero-Workers v. Winship Green Nursing Center*, 103 F.3d 196 (1st Cir. 1996) ....................12, 16

*International Kitchen Exhaust Cleaning Association v. Power Washers of North America*, 81 F. Supp. 2d 70 (D.D.C. 2000) .......... 7

*International News Service v. Associated Press*, 248 U.S. 215 (1918) .......... 6

*Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J. 1998) .......... 22

*Johnson v. Gordon*, 409 F.3d 12 (1st Cir. 2005) .......... 8

*Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215 (1st Cir. 1989) .......... 4

*Klitzner Industries, Inc. v. H.K. James & Co.*, 535 F. Supp. 1249 (E.D. Pa. 1982) .......... 23

*Lotus Development Corp. v. Borland International, Inc.*, 49 F.3d 807 (1st Cir. 1995) .......... 6

*MY-T Fine Corp. v. Samuels*, 69 F.2d 76 (2d Cir. 1934) .......... 23

*MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) .......... 9

*Marvin Music Co. v. BHC Limited Partnership*, 830 F. Supp. 651 (D. Mass. 1993) .......... 24

*Microsoft Corp. v. Harmony Computers & Electronics, Inc.*, 846 F. Supp. 208 (E.D.N.Y. 1994) .......... 6

*Mist-On Systems, Inc. v. Gilley's European Tan Spa*, 303 F. Supp. 2d 974 (W.D. Wis. 2002) .......... 7

*Napa Valley Publishing Co. v. City of Calistoga*, 225 F. Supp. 2d 1176 (N.D. Cal. 2002) .......... 21

*Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4 (1st Cir. 1991) .......... 4

*National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000) .......... 10

*New York Times Co. v. Tasini*, 533 U.S. 483 (2001) .......... 6, 9, 11

*Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57 (1st Cir. 2001) .......... 5

*Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345 (8th Cir. 1994) .......... 24, 25

*Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187 (3d Cir. 1990) .......... 22

*Pacific & Southern Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984) .......................... 24, 25

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ................................ 9

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir. 1981) .................................................................................................. 16, 17

*Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997) ... 10, 11

*Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004) .................................................................................................................. 7

*Prunte v. Universal Music Group*, 484 F. Supp. 2d 32 (D.D.C. 2007) .............................. 7

*Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554 (1st Cir. 1982) ......................... 19

*RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979) .............................. 19

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ........................................................... 17

*Saenger Organization, In. v. Nationwide Insurance Licensing Associate, Inc.*, 864 F. Supp. 246 (D. Mass. 1994) ..................................................................... 18, 23

*Salerno v. City University of N.Y.*, 191 F. Supp. 2d 352 (S.D.N.Y. 2001) ......................... 7

*Salt Water Sportsman, Inc. v. B.A.S.S., Inc.*, No. 87-1144, 1987 U.S. Dist. LEXIS 5249 (D. Mass. June 8, 1987) ....................................................................... 14, 18

*Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56 (1st Cir. 2000) .................................. 8

*Shady Records, Inc. v. Source Enterprises, Inc.*, No. 03 Civ. 9944, 2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. Dec. 30, 2004) ............................................................ 7

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..................................... 21

*SportsMEDIA Technology Corp. v. Upchurch*, 839 F. Supp. 8 (D. Del. 1993) ................. 7

*The Gazette Newspapers, Inc. v. The New Paper, Inc.*, 934 F. Supp. 688 (D. Md. 1996) ............................................................................................................ 12, 14

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995) .................................................................................................................. 20

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ....................................... 12, 13

*Ty, Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002) .......... 12

*United States v. Dickinson*, 465 F.2d 496 (5th Cir. 1972) .......... 21

*WCVB-TV v. Boston Athletic Association*, 926 F.2d 42 (1st Cir. 1991) .......... 12

*Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977) .......... 19

*Well-Made Toy Mfg. Corp. v. Goffa International Corp.*, 210 F. Supp. 2d 147 (E.D.N.Y. 2002), *aff'd*, 354 F.3d 112 (2d Cir. 2003) .......... 6, 7

*Wilson v. Mr. Tee's*, 855 F. Supp. 679 (D.N.J. 1994) .......... 7

## FEDERAL STATUTES & RULES

15 U.S.C. §§ 1125(a), (c) .......... 5, 11

17 U.S.C. § 101 .......... 5, 6

17 U.S.C. § 102(a) .......... 6

17 U.S.C. § 106 .......... 8, 9

17 U.S.C. § 109 .......... 9

17 U.S.C. § 201(c) .......... 6

17 U.S.C. §§ 410(c), (d) .......... 7

*Fed. R. Civ. P.* 65 .......... 1

## STATE STATUTES

Mass. Gen. Laws, ch. 93A, § 11 .......... 17

Mass. Gen. Laws, ch. 110H, §§ 12-13 .......... 17

## MISCELLANEOUS

Nimmer, *The Law of Copyright* ("Nimmer on Copyright") (2008) (LEXIS) .......... 6, 7, 10

## PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted by plaintiff GateHouse Media Massachusetts I, Inc. ("GateHouse") in support of its motion, by order to show cause, for a temporary restraining order and preliminary injunction pursuant to *Fed. R. Civ. P.* 65, enjoining and restraining defendant The New York Times Company from (1) copying, reproducing, uploading, posting, displaying, or distributing plaintiff's copyrighted news content; and (2) using any trademark or trade name of plaintiff's publications in a manner likely to confuse consumers as to the source or sponsorship of defendant's websites and advertisers.

Plaintiff owns and publishes the *Newton TAB*, a free weekly newspaper distributed in Newton, Massachusetts, and vicinity; the *Daily News Tribune*, a paid daily newspaper distributed in Waltham, Massachusetts, and vicinity; and a community news website located on the Internet at Uniform Resource Locator ("URL") http:// home.wickedlocal.com ("wickedlocal.com"). Plaintiff holds copyright interests in both the *Newton TAB* and *Daily News Tribune* (collectively, the "Newspapers") and in wickedlocal.com, as well as federal and/or common law trademark rights in the names of the Newspapers and website.[1] Plaintiff seeks immediate injunctive relief to put a halt to the deliberate and continuing infringement engaged in by defendant on its http://www.boston.com/yourtown/newton website (the "Infringing Website" or "Site"),[2] which was introduced on or about mid-November of 2008. (Reibman Aff., ¶ 15; Blevins Aff., ¶ 3)

---

1 At considerable expense and as detailed below, plaintiff has applied on an expedited basis for registrations for numerous articles containing headlines and ledes from the *Newton TAB*, *Daily News Tribune*, and wickedlocal.com posted without permission on the Infringing Website beginning in November and continuing in December of 2008. (Patel Aff., ¶¶ 10-16) Plaintiff has also applied on an expedited basis for trademark registrations in the Newspapers (*id.*, ¶¶ 3-8), and is the exclusive owner of the *Wicked Local* mark (Complaint, ¶ 34). Because of the continuing threat of infringement and the time-sensitive nature of the newspaper content at issue, plaintiff also seek to enjoin future copyrighted content as more fully addressed, *infra*, at POINT III.

2 The www.boston.com domain name is owned by defendant The New York Times Company.

In sum, defendant is reproducing, distributing and displaying on the Infringing Website unauthorized verbatim copies of the headlines and first sentences (the "ledes") of newspaper and website articles as first published by plaintiff[3] and offering them to readers in violation of the United States copyright and trademark laws. The scope of defendant's infringing acts is staggering: in a little over a month's time, and as of December 17, 2008, defendant has uploaded at least 584 recent headlines and ledes from articles published in the Newspapers and on wickedlocal.com, offering them for free to all who visit the Infringing Website. (Reibman Aff., ¶ 19) Indeed, the vast majority of the content currently available on the Site appears to have been copied and uploaded by defendant from third parties. In other words, the Infringing Website appears to have very little non-infringing content; rather, its primary aim and purpose appears to rely on the unlawful posting of copyrighted material from other sources to break into the local news market throughout the greater Boston region.

Plaintiff is a news organization whose core business model is the provision of hyper-local news content of interest to readers in the Boston metro communities it serves. The Newspapers and wickedlocal.com focus on in-depth news coverage of community events – *e.g.*, town and school board meetings, mayoral press conferences, high school sporting events, police department briefings, etc. — geared toward local readers and local business advertisers. (Reibman Aff., ¶¶ 5-8) Additionally, the Newspapers and wickedlocal.com have developed strong brand identities in these communities that allow them to market other products and services under those brands. By usurping plaintiff's original news content in this manner, as well as using plaintiff's brands to reach the same consumers and same advertisers in the same

[3] By clicking on a lede copied on the Infringing site, the reader is automatically transferred through to the specific web page of the underlying article, causing a new page (plaintiff's URL) to substitute for the previous page (defendant's URL) in the browser window of the reader's computer. Through this practice, known as

markets for their own purposes, defendant is targeting the very heart of plaintiff's business, damaging the substantial good will that plaintiff has invested significant time, effort, advertising and promotion to develop over many years. (Reibman Aff., ¶¶ 3, 5, 17) Defendant's December 11, 2008, press release announcing the launch of the Infringing Website leaves no doubt as to the nature of the entire endeavor: it is part of "a network of hyper-local sites for towns throughout greater Boston" intended to provide a "new cost-effective advertising opportunity for local businesses to reach a very targeted audience" – *i.e.*, plaintiff's audience.

Defendant's actions threaten a broad-reaching impact on plaintiff because its Infringing Website is using plaintiff's own original news content — the very portions of news articles intended to capture at the outset the interest and attention of readers, both in print and online (Reibman Aff., ¶¶ 10-11) — and brand names to drive plaintiff's audience to its own Site. Defendant is therefore benefiting from a free ride on plaintiff's copyrighted materials, and is using plaintiff's valuable intellectual property — the lifeblood of its business — without providing any compensation to plaintiff, the admitted copyright owner. The Infringing Website's commercial advantage lies in the fact that it does not bother creating substantial new material, but instead simply "scrapes" — a euphemism of the highest order — it from others, including plaintiff. (Blevins Aff., ¶ 2; Reibman Aff., ¶ 15) This practice is inimical to the very purpose of copyright law — to provide authors and publishers, like plaintiff, with economic returns to cover the cost of creating new copyrighted works, such as the articles containing the headlines and ledes being copied here. Whatever else might be said about the sort of promiscuous copying displayed on the Infringing Website, it is not concerned with creative authorship.

(..continued)
"hyperlinking" or "deep linking," readers who click through to the web page of the underlying article bypass all the advertising on wickedlocal.com's home page. (Reibman Aff., ¶ 24)

Having been unsuccessful in good faith attempts to enlist the cooperation of defendant in resolving this matter without need for judicial intervention,[4] plaintiff now seeks to enjoin it from the irreparable harm that is the inevitable — and intended — result of its conduct. As explained more fully below and in the accompanying affidavits, plaintiff therefore requires emergency injunctive relief, both a temporary restraining order and preliminary injunction, to halt this major encroachment on its core entire business model.

## ARGUMENT

## POINT I

## THE PRELIMINARY INJUNCTION STANDARD

To obtain a temporary restraining order or a preliminary injunction, plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm (presumed in copyright and trademark cases in this Circuit)[5]; (3) that such injury outweighs any harm that injunctive relief would inflict on defendant; and (4) that the injunction would not adversely affect the public interest. *Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215 (1st Cir. 1989); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4 (1st Cir. 1991); *American Century Home Fabrics, Inc. v. Ashley Furniture Indus.*, 473 F.Supp.2d 168 (D. Mass. 2007).

---

4 Prior to commencing this lawsuit, the General Counsel (Polly G. Sack, Esq.) of GateHouse Media, Inc., plaintiff's parent corporation, wrote defendant on two occasions (November 19 and December 2, 2008) requesting that it refrain from unlawfully copying plaintiff's copyrighted news content on the Infringing Website. Defendant never even deigned to respond to the second letter, choosing instead to issue a press release on December 11, 2008, announcing the market launch of a "Community Web Site" for Newton, Massachusetts, as a pilot for a network of similar sites on Boston.com (*see* Ex. 2 to Reibman Aff.).

5 As elaborated below in the text (*see* POINT IIB., *infra*), the First Circuit has modified the preliminary injunction standard in copyright cases such that when a likelihood on the success of the merits of an infringement claim is shown, irreparable injury is presumed. *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir. 1988). "Under the law of this Circuit, therefore, the most important factor as to whether the Court should issue a preliminary injunction in this case is [plaintiff's] likelihood of success on the merits of its copyright claim." *Flomerics Ltd. v. Fluid Dynamics International, Inc.*, 880 F.Supp. 60, 62 (D. Mass, 1995).

The First Circuit has cogently explained that emergency injunctive relief is often granted in copyright infringement actions because "copyright protects the unique and somewhat intangible interest of creative expression:"

> In such situations, the commercial value of the copyright owner's tangible expression, appropriated by an infringer, may be lost by the time litigation on the claim is complete. Furthermore, monetary recovery at that point may be inadequate to redress the harm.

*Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 611.

To protect their rights in the interim, plaintiff also seeks a temporary restraining order requiring defendant to remove all of plaintiff's copyrighted content from the Infringing Website. Grant of such an order will serve the central and necessary purpose of preserving the status quo until a decision is reached on the merits. *Northern Light Technology, Inc. v. Northern Lights Club*, 236 F.3d 57 (1st Cir. 2001) (granting TRO and ordering defendants to remove and/or modify their website to prevent further public confusion). Without such relief defendant will continue to offer the infringing materials to the public before the Court can hold a hearing and issue an order on the instant application.

## POINT II

## GATEHOUSE IS ENTITLED TO EMERGENCY INJUNCTIVE RELIEF BASED ON DEFENDANT'S INFRINGEMENT OF ITS COPYRIGHTS AND TRADEMARKS

### A. Likelihood of Success on the Merits.

Plaintiff has pleaded claims for, *inter alia*, violation of the *Copyright Act* of 1976, 17 U.S.C. § 101, *et seq.* (the "*Copyright Act*"); Sections 43(a) and (c) of the Lanham Act, 15 U.S.C. §1125(a) and (c) (the "Lanham Act"); trademark infringement and dilution based on Massachusetts statutory law; and unfair competition based on Massachusetts statutory and

common law. For the reasons discussed below, GateHouse has more than amply satisfied its burden under the applicable standards for each such claim.

### 1. Plaintiff Has Established a *Prima Facie* Case of Copyright Infringement.

To establish a claim for infringement under the *Copyright Act*, plaintiff must demonstrate ownership of valid copyright interests in the infringed works, and copying of those works by defendant. *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Harper & Row Publishers, Inc. v. National Enterprises*, 471 U.S. 539, 548 (1985); *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 605 (1st Cir. 1988); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995). *See* Nimmer, *THE LAW OF COPYRIGHT*, § 13.01 at 4-13 (2008) ("*NIMMER ON COPYRIGHT*"). In this context, the term "copying" constitutes a "shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106." *Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F.Supp. 208, 210 (E.D.N.Y. 1994) (citation omitted). Here, defendant is infringing GateHouse's exclusive rights under § 106 of reproduction, distribution and display, and has therefore violated Section 501(a) of the *Copyright Act*. *Flomerics Ltd. v. Fluid Dynamics Int'l, Inc.*, 880 F.Supp. 60, 62 (D. Mass. 1995) (finding copyright violation where "the copying . . . is so blatant that it repeats verbatim phrases").

#### a. Plaintiff Holds the Necessary Copyright Interests.

As set forth in the affidavit of its counsel, GateHouse holds a valid copyright interest in each of the numerous articles referred to therein published in the Newspapers and wickedlocal.com[6] from which the headlines and ledes have been copied verbatim on

---

[6] For each published edition of the *Newton TAB*, *Daily News Tribune* and/or wickedlocal.com, GateHouse is also the owner of the copyright interest in the publication as a whole as a "collective work," defined as "a work such as a periodical issue . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. The *Copyright Act* makes clear that

Boston.com. (Patel Aff., ¶¶ 10-17) Under the *Copyright Act*, a copyright interest inheres in any work of authorship from the moment of creation. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1160 (1st Cir. 1994); *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F.Supp.2d 147, 157 (E.D.N.Y. 2002) (citing 17 U.S.C. § 102(a)). Early in the previous century, the U.S. Supreme Court determined that newspaper articles were literary works that were copyrightable. *Int'l News Service v. Associated Press*, 248 U.S. 215 (1918).

A valid certificate of copyright registration constitutes *prima facie* evidence of the validity of the copyright and of ownership (17 U.S.C. § 410(c)). As more fully described in the accompanying affidavit, plaintiff has applied for expedited copyright registrations of extensive materials in its Newspapers and on its website which have been the subject of defendant's copying challenged by the Complaint. (Patel Aff., ¶¶ 10-16 and Exs. 3-4) Courts in numerous circuits have confirmed that a pending application for copyright registration is sufficient in order to proceed with a copyright infringement action. [7] *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004); *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010 (8th Cir. 2006); *Foraste v. Brown Univ.*, 248 F.Supp.2d 71, 77-8 (D.R.I. 2003); *Salerno v. City Univ. of N.Y.*, 191 F.Supp.2d 352, 356 (S.D.N.Y. 2001) (pending application sufficient); *Well-Made Toy Mfg. Corp.*, 210 F.Supp.2d at 157 (citing NIMMER ON COPYRIGHT for same proposition), *aff'd*, 354 F.3d 112 (2d Cir. 2003); *Mist-On Systems, Inc. v. Gilley's European Tan Spa*, 303

(..continued)
"[c]opyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole . . . ." 17 U.S.C. § 201(c); *see also New York Times Co. v. Tasini*, 533 U.S. 483, 488 (2000).

[7] According to Nimmer, authorizing a party which has applied to register a copyright to litigate an infringement claim "better comports with the statutory structure" of the *Copyright Act*. NIMMER ON COPYRIGHT, §7.16[B] at 2-7 (2008) (LEXIS); *Prunte v. Universal Music Group*, 484 F.Supp.2d 32, 39-40 (D.D.C. 2007) (following this approach as that of "the leading copyright treatise"). *See also Datatel, Inc. v. Rose & Tuck, LLC*, No. 05-495, 2005 U.S. Dist. LEXIS 29704, at *24-27 (E.D. Va., June 17, 2005); *Iconbazaar L.L.C. v. America Online, Inc.*, 308 F.Supp.2d 630, 634 (M.D.N.C. 2004); *Shady Records, Inc. v. Source Enters., Inc.*, 03 Civ. 9944, 2004 U.S. Dist. LEXIS 26143, at *26-7 (S.D.N.Y. Dec. 30, 2004); *Gable-Leigh, Inc. v. N. Am. Miss.*, No. CV 01-01019, 2001 U.S. Dist. LEXIS 25614, at *14-15 (C.D. Cal. April 13, 2001); *Int'l Kitchen Exhaust Cleaning Ass'n v. Power*

F.Supp.2d 974, 977 (W.D. Wis. 2002); *Wilson v. Mr. Tee's*, 855 F.Supp. 679, 682-83 (D.N.J. 1994). Here, because the headlines and ledes appearing on the Infringing Website are for the most part current or very recent publications, at the time that it learned of the Site plaintiff had not yet even applied for registration. Yet plaintiff has now applied for registrations[8] for numerous articles containing the headlines and ledes copied by defendant, as specifically set forth in the annexed affidavit. (Pate Aff., ¶¶ 10-16) As explained in POINT III below, the emergency relief requested would extend beyond the pending applications to each news article in plaintiff's publications, as created.

**b. Defendant Is a Direct Infringer.**

Although proof of infringement often involves a determination by the court as to whether a defendant has had access to the allegedly infringed work, and whether the allegedly infringing work is substantially similar, this is one of the rare cases where there is direct proof of actual copying, and thus no need to revert to indirect evidence. *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005) (to show copying actually occurred for purposes of maintaining copyright infringement action, plaintiff may produce direct evidence); *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 61-62 (1st Cir. 1995) (to demonstrate actionable copying, a plaintiff may present direct evidence of actual copying). One need only glance at the headlines and ledes from the *Newton TAB*, *Daily News Tribune* and wickedlocal.com (including the latter's blog commentary) which appear on defendant's Infringing Website to see that they are verbatim

(..continued)
*Washers of N. Am.*, 81 F.Supp.2d 70, 72 (D.D.C. 2000); *Havens v. Time Warner, Inc.*, 896 F.Supp. 141, 142-43 (S.D.N.Y. 1995); *SportsMEDIA Tech. Corp. v. Upchurch*, 839 F.Supp. 8, 9 (D. Del. 1993).

8 Requesting expedited treatment can shorten the processing time for copyright applications by the Copyright Office from several months to a matter of days or weeks. The processing fee for expedited registrations is $685 per registration, and GateHouse's efforts to expedite multiple registrations in this instance has therefore resulted in significant expenditure of both time and money. (*See* Patel Aff., ¶¶ 15, 19) *See* www.copyright.gov/docs/fees.html. The effective date of a copyright registration is the date upon which the application is received by the Copyright Office, assuming it is later deemed acceptable for registration (that is, the registration "relates back" to the date of filing of the application). 17 U.S.C. § 410(d).

digital copies of the originals. And if there could be any doubt, pre-litigation correspondence from defendant's General Counsel acknowledged that the challenged copying has occurred. (*See* Ex. 2 to Grygiel Aff.)

As explained below, defendant's above-described actions constitute violations of at least three of the exclusive rights reserved to plaintiff under 17 U.S.C. § 106: the reproduction right, the distribution right and the display right.

**(1) Violation of GateHouse's Reproduction Right.**

There can be no question but that the word-for-word versions of plaintiff's headlines and ledes that appear on the Infringing Website are "copies" for purposes of the *Copyright Act.* Computerized "cutting and pasting" of an online work such as that engaged in by defendant here is a stereotypical "reproduction," little different from cutting and pasting a photocopy except that it is stored in digital format on boston.com's servers. "The [information] stored in the computer is the 'copy' of the work for purposes of copyright law." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). As demonstrated above, it is defendant itself who has created these multiple infringing digital copies by "scraping" their content directly from wickedlocal.com, and each such digital copy is an unauthorized reproduction that violates GateHouse's exclusive right "to reproduce the copyrighted work[s] in copies" under § 106(1) of the *Copyright Act.*[9] *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-18 (9th Cir. 1993) (a computer makes a "copy" of a software program when it transfers the program from a third-party's computer, or other storage device, into its own memory). Thus, this act alone

---

[9] Because the above conduct constitutes or involves copying of copyright-protected works, defendant can take no solace from the "first sale" doctrine. That doctrine recognizes that the owner of a lawful tangible copy of a work is entitled to display, sell, or otherwise use *that* particular tangible copy in certain limited circumstances (17 U.S.C. § 109; *see Bourne v. Walt Disney Co.*, 68 F.3d 621, 632 (2d Cir. 1995)). For example, a consumer who subscribes to a newspaper for home delivery may sell that specific tangible copy on eBay, but the first sale doctrine does not give that consumer the right to copy, display or distribute unauthorized verbatim copies of its headlines and ledes on the Internet, as defendant is doing here.

constitutes direct copyright infringement, made all the more potent through the technology of the Internet, which affords an "easy and accessible means" of virtually simultaneously republishing copies to millions of viewers throughout the world. *See, e.g., American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2d Cir. 1994) (addressing "mechanical reproduction of documents").

**(2) Violation of GateHouse's Display Right.**[10]

Defendant is also infringing GateHouse's exclusive rights to distribute its works and display those works publicly.[11] 17 U.S.C. § 106(3) and (5). "As to the latter, by definition, to display a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." *NIMMER ON COPYRIGHT* § 8.20[A] (citations omitted). This includes "projection of an image on a screen ... and the transmission of an image by electronic or other means, as well as the showing of an image on a cathode ray tube, or similar apparatus in connection with computers..." *Id.*

The most comprehensive judicial explication of the display right in connection with Internet websites is found in *Perfect 10, Inc. v. Amazon.com, Inc.*, where the Ninth Circuit

---

10 In the context of an Internet website, the display and distribution rights of newspaper content tend to overlap or merge. Nevertheless, they remain independent exclusive rights protected under the *Copyright Act*, and we address each separately in the text below. *See New York Times Co. v. Tasini*, 533 U.S. at 498 n.8 ("[T]he fact remains that the Act enumerates several separate rights of copyright owners, and the public display right is independent of the reproduction and distribution rights.")

11 An unauthorized display is infringing only if it is public. "To perform or display a work 'publicly' means (I) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (I) or the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. 101. " [A] transmission need not be made directly to the public in order for there to be a public performance or display;" rather, "Congress intended the definitions of 'public' and 'performance' to encompass each step in the process by which a protected work wends its way to its audience." *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12 (2d Cir. 2000). A transmission by means of a publicly available website is clearly a public display. *See, e.g., Getaped.com, Inc. v. Cangemi*, 188 F.Supp.2d 401, 401-02 (S.D.N.Y. 2002); *Cartoon Network LP v. CSC Holdings Inc.*, 2008 WL 2952614, *17 (2d Cir. Aug. 4, 2008) (transmission of a digital copy created by user on cable system and ordered by same user not "public").

explained that for photographic images, a " computer owner shows a copy 'by means of a ... device or process' when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer." 588 F.3d at 1160. Applying that analysis here, there can be no doubt that the communication of digital copies of plaintiff's headlines and ledes to visitors to the Infringing Website constitutes a "display."[12] *Id.*; *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F.Supp. 543, 551-52 (N.D. Tex. 1997) (held, defendant displayed plaintiff's copyrighted images when it "allowed . . . subscribers to view copyrighted works on their computer monitors while online").

**(3) Violation of GateHouse's Distribution Right.**

Although its violation of GateHouse's display right alone requires injunctive relief, defendant has also violated plaintiff's exclusive distribution right under § 106(3) of the *Copyright Act* by transmitting the headlines and ledes published on wickedlocal.com to readers on the Infringing Website. A digital transmission of information delivered to a computer over the Internet constitutes a violation of the distribution right. *See N.Y. Times Co. v. Tasini*, 533 U.S. at 498 (computer database program distributed copies of newspaper articles stored in its database by selling copies through its database service); *Playboy Enters. v. Webbworld*, 991 F.Supp. at 551-52 (allowing users to download images via web browser is distribution).

---

12 In *Perfect 10*, the Ninth Circuit drew a distinction between a service that provided HTML instructions to the user's browser, directing the user's computer to the website that actually delivered the content on the one hand; and a service that serves up the content directly, on the other. *Id.* at 1161. The former did not infringe the display right of the owner of the underlying work, while the latter does infringe that exclusive right. In the instant case, the Infringing Website serves up plaintiff's content directly: it provides direct access to the headlines and ledes, so under the Ninth Circuit's "server test" — which arguably reads the "display" right too narrowly, given its expansive intended scope as revealed in the legislative history of the 1976 *Copyright Act* (*see* H.R. Rep. No. 94-1476 at 71 (1976) — the Site clearly violates the exclusive display right of GateHouse.

### 2. Plaintiff's Trademark Claims.

As detailed below, defendant's "scraping" practice is likely to cause confusion as to the source of origin of the content posted on the Infringing Website and/or as to whether plaintiff endorses either the reproduction of its original content therein, or the Site itself. Indeed, defendant's profligate use of GateHouse's trademarks conveys the impression that the parties have agreed to some form of joint venture (which they have not), or that plaintiff's original content is being used by permission (which it is not). In either case, the public is likely to be confused as to the "affiliation, connection, or association of [defendant] with [plaintiff], [and] as to the origin, sponsorship, or approval of [defendant's] goods, services or commercial activities," in violation of Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A).

#### a. Trademark Infringement and Unfair Competition.

Under 15 U.S.C. §1125(a), plaintiff in a trademark infringement and/or unfair competition action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's mark,[13] as part of the sale or distribution of goods or services, and (4) that such use is likely to cause confusion. *Int'l Assoc. of Machinists & Aero-Workers v. Winship Green Nursing Center*, 103 F.3d 196, 200 (1st Cir. 1996) (likelihood of confusion dispositive inquiry in Lanham Act case). Accordingly, a claim of trademark infringement is analyzed under the familiar two-prong test that looks first to whether plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of defendant's goods. *See WCVB-TV*

---

[13] Section 43(a) of the Lanham Act protects from infringement unregistered marks, such as *Newton TAB* and *Daily News Tribune* here. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-8 (1992) ("it is common ground that §43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)"). *See also The Gazette Newspapers, Inc. v. The New Paper, Inc.*, 934 F.Supp. 688, 692 (D. Md. 1996) ("The Lanham Act . . . protects certain unregistered trademarks from misappropriation").

*v. Boston Athletic Ass'n*, 926 F.2d 42, 44 (1st Cir. 1991) ("Trademark law prohibits the unauthorized use of a mark, but only where doing so creates a 'likelihood of confusion' about who produces the goods or provides the service in question.") (citations omitted).

### b. Plaintiff's Marks *Newton TAB* and *Daily News Tribune* Qualify for Trademark Protection.

Generally, "a mark is entitled to trademark protection if it is capable of functioning as a source-identifier of goods [or services]." *Boston Duck Tours, LP v. Super Duck Tours*, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 769).[14] (1992)). Marks may be placed "along a spectrum of distinctiveness, based on their capacity to serve such a source-identifying function." *Id.*, at 12. This spectrum includes, from weakest to strongest, marks that are (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or (5) fanciful. *Two Pesos, Inc., supra*, 505 U.S. at 768. "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."[15] *Id.*

A mark "is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d

---

14 As recently explained by the United States Court of Appeals for the First Circuit in *Boston Duck Tours*:

> Serving to distinguish and identify goods, as well as their sources, trademarks concisely impart information to consumers, reducing their search costs and allowing them to make decisions that more closely coincide with their preferences. See *Ty, Inc. v. Perryman*, 306 F.3d 509, 510 (7th Cir. 2002) ("The consumer who knows at a glance whose brand he is being asked to buy knows whom to hold responsible if the brand disappoints and whose product to buy in the future if the brand pleases."). Because consumers rely heavily on trademarks when making choices, businesses also have an incentive to maintain product quality, lest they lose disappointed consumers. *See id.*

531 F.3d at 12 (citations in original text).

15 "Descriptive marks are those that 'convey[] an immediate idea of the ingredients, qualities or characteristics of the goods' to which they are attached . . . such as SPORTS ILLUSTRATED for a sports magazine." *Boston Duck Tours, supra*, 531 F.3d at 13 (citations omitted). To be protected, descriptive marks must have acquired "secondary meaning." *Id.* Accordingly, a mark is distinctive and therefore worthy of protection from infringement if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *See Two Pesos, Inc., supra*, 505 U.S. at 769.

542, 544 (1st Cir. 1995). *See also Am. Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 106 (2d Cir. 1978) (holding the mark "Roach Motel" to be suggestive because "while roaches may live in some motels against the will of the owners, motels are surely not built for roaches to live in")).

Plaintiff's mark *Newton TAB* qualifies as a suggestive, if not a fanciful mark.[16] For example, Merriam-Webster's Online Dictionary states that "Tab" can be an abbreviation for "Tabloid," the definitions of which include "digest" or "summary," or "a newspaper that is about half the page size of an ordinary newspaper and that contains news in a condensed form and much photographic matter." *See* http://www.merriam-webster.com/dictionary/tabloid2 (last visited December 17, 2008). Here, moreover, plaintiff utilizes the stylized "TAB" in all upper case letters, rather than merely using the word "Tab." Accordingly, far from "conveying an immediate idea of the . . . qualities or characteristics" of plaintiff's product, *Newton TAB* as a mark "requires some measure of imagination" to connect the mark to the underlying news product and, by extension, GateHouse. *Id.* Accordingly, it qualifies as a suggestive mark entitled to trademark protection.

Plaintiff's mark *Daily News Tribune* arguably stands on different grounds. Yet, "[b]ecause periodicals depend primarily on their titles to convey their character, courts are reluctant to declare magazine titles generic, and instead usually find them descriptive and thus entitled to protection upon proof of secondary meaning." *See Salt Water Sportsman, Inc. v. B.A.S.S., Inc.*, No. 87-1144, 1987 U.S. Dist. LEXIS 5249, at *8-*9 (D. Mass. June 8, 1987) (citing *Am. Ass'n. for the Adv. of Science v. Hearst Corp.*, 498 F.Supp. 244 (D.D.C. 1980)

---

16 *See Boston Duck Tours, supra*, at 13 n.12 ("A fanciful mark is a word that is coined for the express purpose of functioning as a trademark. It could also be any obscure or archaic term not familiar to buyers. The mark EXXON is fanciful because it was invented or designed solely to designate petroleum and other related goods. It has no other meaning.") (citation omitted)

(holding that "Science" is descriptive as a magazine title)). The same principle applies to newspaper titles, such as the *Daily News Tribune* here. *See Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) (finding newspaper title worthy of trademark protection where "[t]he words [*Duluth News-Tribune*] convey meaning too directly to be suggestive, yet are too specific to be generic"); *The Gazette Newspapers v. The New Paper,* 934 F.Supp. at 693 ("The policies underlying the [trademark] classifications, however, indicate that 'Gazette' should be considered descriptive"). Accordingly, plaintiff's mark *Daily News Tribune* is protectable upon proof of secondary meaning.

This Court applies a four-part test for determining whether a descriptive mark, here *Daily News Tribune*, has acquired secondary meaning, which examines "the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's attempts to protect and promote the mark." *Borinquen Biscuit Corp. v. M.V. Trading Corp*, 443 F.3d 112, 121 (1st Cir. 2006); *Salt Water Sportsman, Inc. v. B.A.S.S., supra*, 1987 U.S. Dist. LEXIS 5249, at *10-*11. First, *Daily News Tribune* has been in continuous use since 1882, and was the City of Waltham, Mass.'s first daily newspaper. (Reibman Aff., ¶ 3) Therefore, the first element unquestionably favors the strongest possible protection for plaintiff's mark. Second, plaintiff advertises and promotes the *Daily News Tribune* and its online edition (www.dailynewstribune.com) as the principal source of timely and accurate information relating to the City of Waltham and environs. As to the pertinent market, prior to its roll-out of the Infringing Website, defendant had no presence whatsoever in the cities of Newton and Waltham, except through *The Boston Globe* and its online edition www.Boston.com, neither of which competed directly with the *Daily News Tribune*. In sum, the *Daily News Tribune* has gained

secondary meaning in the City of Waltham and environs because it has been the preeminent reliable source of local news coverage there for more than 125 years.

Next, GateHouse has not consented to or authorized defendant's use of their marks *Newton TAB* and *Daily News Tribune* on the Infringing Website, and such use — unquestionably in commerce — is therefore without consent. (Complaint, ¶ 2; Reibman Aff., ¶ 22)

The third element of the Lanham Act claim is use of plaintiff's trademark in connection with "goods or services." Clearly defendant is using plaintiff's marks on and in connection with unauthorized copies of plaintiff's original headlines and ledes posted on the Infringing Website, which is itself a "service" in commerce. Indeed, defendant is actually displaying an altered version of plaintiff's *Newton TAB* mark by failing to use upper-case letters in the word "TAB," thus exacerbating the confusion as to the source of origin of the materials. Consequently, the Infringing Website, with its abundant unauthorized copies of plaintiff's mark, headlines and ledes, reduces to little more than the online equivalent of the counterfeit Louis Vuitton® handbags found on the streets of nearly every major city. In either case, the infringing party is displaying a protected mark without permission as part of its presentation of inferior goods and services for sale in commerce.

**c. Plaintiff Has Made Out a *Prima Facie* Case of Confusion.**

The last element of proof on the Lanham Act claim is whether defendant's use of plaintiff's marks is likely to cause confusion as to the origin or source of content posted on the Infringing Website, or to suggest sponsorship, association or endorsement, determined in the First Circuit under the test set forth in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981). The *Pignons* factors, which "may be given more or less weight depending on the particular circumstances of the case," (*Beacon Mut. Ins. Co. v.*

*OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir. 2004))[17], examine (1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting the mark; and (8) the strength of plaintiff's mark. *Id.*

In the present context, the 8-part *Pignons* test tips decidedly in GateHouse's favor. First, defendant has reproduced the exact names of plaintiff's marks on the Infringing Website in the context of its promotion of goods and/or services, *i.e.*, news content, that is indistinguishable from those offered by plaintiff. (Reibman Aff., ¶ 22) Second, the parties are unquestionably using the same channels of trade, targeting the same advertising revenue, and seeking viewership from the same classes of consumers. (*Id.*, ¶ 17) Defendant's intent in adopting plaintiff's marks is not readily apparent without discovery, but appears to be a deliberate attempt to confuse the public into believing that plaintiff sponsors or otherwise endorses the posting of its original content on the Infringing Website. These factors, particularly at the preliminary injunction phase, all point to a likelihood of confusion.

By the scraping and copying process already described, defendant has created multiple digital copies of literally hundreds of plaintiff's headlines and ledes. (Reibman Aff., ¶ 19) These, in turn, bear plaintiff's original marks *Newton TAB* (which is displayed in an altered form "Newton Tab") and *Daily News Tribune*, under which they are offered to the consuming public in interstate commerce. Defendant is using plaintiff's trademarks here in a manner that suggests sponsorship or association with their entire Infringing Website, not just the copies of plaintiff's

---

[17] *See also The Int'l Ass'n of Machinists and Aerospace Workers*, *supra*, 103 F.3d at 201 (holding that the 8-part test reproduced above in the text "is not intended to be all-encompassing or exclusive . . . Not one listed factor is determinate, and any other factor that has a tendency to influence the impression conveyed to prospective

headlines and ledes that are displayed on the Site. Multiple references to plaintiff's marks are commingled with those of other publications and displayed throughout the Infringing Website. Indeed, defendant's own description of the Site as a "digital town center" (*see* Ex. 2 to Reibman Aff.) which presents information from "multiple news stories, blogs and other editorial content" (*see* Ex. 2 to Grygiel Aff.) in a seamless mix confirms how it is likely to be viewed by readers: as a one-stop-website-shop for local news in Boston's surrounding communities. The confusing (and false) impression that this amalgamation of original content from various sources is likely to impart to consumers is that plaintiff authorized the Site to display its marks and, further, licensed or endorsed the Site's use of content from the Newspapers and wickedlocal.com – or, in the alternative, that the unauthorized copies were the original reportage of Boston.com. (Reibman Aff, ¶ 22) Either scenario is a clear violation of the Lanham Act.[18] Simply put, the reader of news information on a website, "like the purchaser of a can of peas, has a right not to be mislead as to the source of the product." *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989).

## B. Irreparable Harm Is Presumed Based on Defendant's Acknowledged Copying of GateHouse's Copyrighted News Content.

The second element that GateHouse must satisfy in order to receive the emergency relief sought is to establish that it will suffer irreparable harm. That plaintiff has established irreparable harm in this case is clear, whether based upon the presumption that arises in the First Circuit given the nature of plaintiff's asserted rights, or on the facts as detailed in the accompanying declarations and affidavits.

(..continued)
purchasers by the allegedly infringing conduct may be weighed by the judge or jury in gauging likelihood of confusion")

[18] It is also a violation of Massachusetts statutory and common law prohibiting trademark infringement, unfair competition and unfair business practices, which similarly require a showing of confusion. *See* Mass. Gen. Laws, ch. 110H, §§ 12-13 (2006); Mass. Gen. Laws, ch. 93A, § 11; *Pignons*, 657 F.2d at 493.

We begin with the well-established presumption that "irreparable harm is usually presumed" when a copyright plaintiff makes out a *prima facie* showing of infringement. *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.* 843 F.2d 600, 611 (1st Cir. 1988); *Flomerics Ltd. v. Fluid Dynamics Int'l, Inc.*, 880 F.Supp. 60, 62 (D. Mass. 1995). The rule in this Circuit is simple: there is ***"no need actually to prove irreparable harm when seeking an injunction against copyright infringement."*** *Concrete Machinery Co., supra,* 843 F.2d at 612 (emphasis supplied); *Saenger Organization, In. v. Nationwide Ins. Licensing Assoc., Inc.,* 864 F.Supp. 246, 249 (D. Mass. 1994). *See also Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.*, 25 F.3d 119, 124 (2d Cir. 1994) ("when a copyright is infringed, irreparable harm is presumed; this is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways."). Likewise, irreparable harm is also presumed in a trademark infringement action when there is a likelihood of confusion. *Camel Hair & Cashmere Inst., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986); *Salt Water Sportsman, Inc. v. B.A.S.S., Inc.*, No. 87-1144, 1987 U.S. Dist. LEXIS 5249 (D. Mass., June 8, 1987). *American Cyanamid Co. v. Campagna Per Le Farmacie In Italia SPA.*, 847 F 53, 55 (2d Cir. 1988) ("In trademark cases, a showing of likelihood of confusion as to source or sponsorship [of the goods] establishes the requisite likelihood of success on the merits as well as risk of irreparable harm.") (internal citations omitted). In addition, where, as here, there has been deliberate copying, the presumption becomes virtually irrebuttable. *ASICS Corp. v. Antillas Shoe Corp.*, No. 89-0442, 1989 U.S. Dist. LEXIS 15332, at *15 (D.P.R., Apr. 18, 1989); *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 561 (1st Cir. 1982). *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979); *Friendly Publs., Inc. v, Creative Handbook Servs.*, 79 Civ. 2758, 1979 U.S. Dist. LEXIS 8982 (S.D.N.Y. Oct. 24, 1979).

Even absent that presumption, it is palpably evident that plaintiff has been and will continue to be irreparably harmed by defendant's conduct. Defendant has lifted, wholesale and verbatim, plaintiff's valuable intellectual property, consisting of editorial content from plaintiff's Newspapers and website — the brands plaintiff has worked to establish as reflected in the trademarks of those properties, and the substantial good will plaintiff has invested extensive time and resources to develop over several decades. (Reibman Aff., ¶¶ 3, 5-8) Copying headlines and ledes verbatim from plaintiff's copyrighted works, uploading them on a continuing basis, and encouraging users to read them online at Boston.com instead of in the Newspapers or at GateHouse's own authorized and licensed local news website is a direct usurpation of plaintiff's property. Editorial decisions at any given newspaper or website reflect the publisher's views as to what will be of interest to its readers, what will make its readers want to read each edition of the newspaper or return to the website, what advertisements will appeal to their target readership (both print and online), and in what order stories should be presented and with what emphasis. (*Id.*, ¶¶ 10-11) *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977) ("What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments."). These and countless other editorial considerations that go into each article — and, more specifically, into the selection, tone and phraseology of the headlines and ledes — published in the Newspapers and on wickedlocal.com are instrumental in establishing the "brand" that they represent. Defendant is effectively appropriating that entire creative and editorial decision-making process by selectively copying plaintiff's content and displaying it on Boston.com.

Plaintiff has absolutely no way of knowing how many potential readers of its Newspapers have declined or will decline to read them because they can simply access their highlights for free online at the unauthorized Site. Likewise, plaintiff has no way of quantifying how many consumers did not visit plaintiff's own authorized site because certain of the same information is now available at Boston.com. Further, as in the case of music industry websites such as Napster and Grokster which allowed the sharing of individual songs from whole albums, consumers may simply read a single headline and lede from a particular issue of one of plaintiff's copyrighted publications on the Infringing Website, rather than buying the entire newspaper or subscribing to it, or obtaining access through the homepage of wickedlocal.com, where they would be exposed to plaintiff's online advertisers. Similarly, plaintiff has no way of knowing how many advertisers — particularly local businesses attracted by wickedlocal.com's local news content and penetration into the Newton and Waltham communities (*see* Reibman Aff., ¶ 26) — who might otherwise be inclined to advertise on its website but, seeing that defendant's "hyperlinking" practice bypasses *Wicked Local*'s home page, will decline to do so. By copying wickedlocal.com's content onto a website specifically designed and intended to compete with it in providing local news coverage of community events, boston.com/yourtown/newton "serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591 (1994). *See also Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (finding irreparable harm "where there is a threatened imminent loss that will be very difficult to quantify at trial"). Because defendant is using the copyrighted material for commercial gain, the likelihood of meaningful future harm is presumed. *Sony Corp. v. Universal Studios, Inc.*, 464 U.S. 417, 451 (1984).

Defendant undoubtedly knows, from its own experience and as indicated by its topical selection of plaintiff's headlines and ledes on the Infringing Website, that most news content is time-sensitive – wickedlocal.com publishes and revises its content continuously throughout each day, the *Daily News Tribune* is a daily, and the *Newton TAB* is a weekly. *United States v. Dickinson*, 465 F.2d 496, 512 (5th Cir. 1972) ("timeliness of publication is the hallmark of 'news,' and the difference between 'news' and 'history' is merely a matter of hours"); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("The newsworthiness of a particular story is often fleeting."). The window of opportunity to attract readers, particularly for unique visitors to plaintiff's authorized website, is an extremely limited one. By usurping that window of opportunity, defendant is threatening to appropriate GateHouse's core business model. (Reibman Aff., ¶¶ 14, 17) That is, without question, the very essence of irreparable harm. *See, e.g., Napa Valley Publishing Co. v. City of Calistoga*, 225 F.Supp.2d 1176, 1182 (N.D. Cal. 2002) (held, preventing publisher from distributing papers on newsstand would cause irreparable injury):

> That loss is especially significant (and irremediable) for a periodic publication whose publication loses value with each passing period. That lost opportunity to disseminate time sensitive speech cannot be remedied after trial. Preventing injury that cannot later be repaired is precisely the kind of irreparable injury that warrants preliminary injunctive relief.

## C. The Balance of Hardships Weighs in Favor of Injunctive Relief.

As described above, the harm confronting plaintiff is potentially devastating: if unchecked, it could seriously damage GateHouse's ability to provide local news coverage to the suburban Boston communities it has historically served, the very heart of its business. (Reibman Aff., ¶ 26) In contrast, any resultant injury to defendant from a temporary restraining order and preliminary injunction would be slight indeed. Defendant's website is the dominant online news

content provider in the Boston metro region, which has built its market and has an established following. (*Id.*, ¶ 13) Defendant cannot credibly maintain that it will suffer any financial injury as a consequence of a temporary injunction, beyond whatever small part of the limited initial investment — dedicated almost exclusively to "scraping" content from the websites of other competing news organizations for use on boston.com/yourtown/newton – it has made to date to launch the Infringing Website,[19] if it turns out that injunctive relief was improvidently granted. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.' " *Concrete Machinery,* 843 F.2d at 612 (citation omitted).

Perhaps most importantly, even if defendant could establish some theoretical adverse financial impact from a temporary injunction, it is in no position to complain about it, as it should have considered the consequences of its actions before it launched a website feature that has copyright infringement as a major component of its purpose and design. Defendant apparently even went so far as to circumvent the JavaScript code installed by plaintiff to impede the "cutting and pasting" of content from wickedlocal.com for use on its unauthorized site. (Blevins Aff., ¶¶ 4-7) *See Opticians Ass'n of Am. v, Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (defendant cannot claim to be harmed "since it brought any and all difficulties occasioned by the issuance of an injunction upon itself"); *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 312 (D.N.J. 1998) ("Defendant cannot complain that he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark ... with full

---

[19] Moreover, because the vast majority of material on defendant's yourtown/newton site link consists of ***plaintiff's*** copyrighted content (Reibman Aff., ¶¶ 15, 20-21) along with that of other publishers, and because of the limited scope of the relief sought, defendant cannot claim that any property of its own creation is at risk, or that a temporary injunction will interfere with its legitimate rights to disseminate content or its First Amendment right to speak publicly. Defendant would remain able at all times, as it was before, to publish its own copyrighted material on boston.com. Indeed, the only speech at issue is plaintiff's copyright-protected content.

knowledge of the rights of the Plaintiff'). Simply put, in balancing hardships as between plaintiff and defendant, "[a]dvantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d. Cir. 1934).

**D. The Public Interest Is Served By Upholding Copyright Law Protections.**

As this Court has observed, the public interest would necessarily be served by the issuance of an injunction in this context, because "all public policy issues militate in favor of upholding copyright protection." *Saenger Organization v. Nationwide Insurance Licensing Assoc.*, 864 F.Supp. at 249. Indeed, "the issue of public policy is rarely a genuine issue if the copyright owner has established a likelihood of success" on the merits of its infringement claim. *Concrete Machinery Co.*, *supra*, 843 F.2d at 612. Here, an injunction will "preserve the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights." *Atari, Inc. v. N. American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982).

> Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (quoting *Klitzner Industries, inc. v. H.K. James & Co.*, 535 F.Supp. 1249, 1259-60 (E.D. Pa. 1982)).

## POINT III

## SCOPE OF THE INJUNCTION SOUGHT

Plaintiff seeks to enjoin defendant from infringing both its current copyrighted newspaper and website content, and also its future copyrightable content, given the established likelihood – indeed, the inevitability[20] — that defendant will infringe plaintiff's future works each day as they are published, unless enjoined. *Cipes v. Mikasa, Inc.*, 404 F.Supp.2d 367, 371-72 (D. Mass. 2005); *Marvin Music Co. v. BHC Ltd. P'ship*, 830 F.Supp. 651, 655 (D. Mass. 1993). Such relief is available where, as here, defendants have "engaged in a pattern of infringement of a plaintiff's registered copyrights and can be expected to continue to infringe new copyrighted material emanating in the future from the plaintiff." *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994); *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1499 (11th Cir. 1984). This prophylactic relief would further the purposes of the Copyright Act, particularly given that, even if GateHouse was willing to pay the $685 fee for expedited registration from the Copyright Office for each such Newspaper and/or online article at issue, it would not receive the registrations for eight to fifteen days — which would exceed the lifespan of these publications in the news cycle. By that point, the copies will have been posted on the Infringing Website, potentially displacing viewer traffic from wickedlocal.com to boston.com.

In *Pacific & Southern Co.*, defendants had regularly copied a daily news broadcast and sold the tapes, and would have continued to do so unless enjoined. The Eleventh Circuit found that unless plaintiff could obtain an injunction against future infringement, it would only be able to enforce its copyrights against defendant by finding out which stories had been copied and

---

20 Defendant has refused to comply with plaintiff's cease-and-desist letters (not even bothering to respond to the second letter), publicly announced the launch of the yourtown/newton site link subsequent to its receipt of those letters, and continues to add to Boston.com on a daily basis copies of headlines and ledes published by plaintiff in the Newspapers and on wickedlocal.com. (Grygiel Aff., ¶ 4; Reibman Aff., ¶ 13, 18-19 and Ex. 2)

sold, registering those stories, and bringing serial infringement actions against the defendant. The court held that "this is a classic case, then, of a past infringement and a substantial likelihood of future infringements which would normally entitle the copyright holder to a permanent injunction against the infringer pursuant to 17 U.S.C. § 502(a)." 744 F.2d at 1499. The court concluded that the power of the district courts to issue injunctions is not limited to works already in existence, but applies to future works as well. *Id.* Similarly, in *Olan Mills*, a professional photographer and society of professional photographers brought an action against a photo developer who, they alleged, was likely to continue to make infringing reproductions of photographs. The Eighth Circuit found that when "a copyright owner has established a threat of continuing infringement, the owner is entitled to an injunction regardless of registration." 23 F.3d at 1349.

Like the defendants in those cases, through its conduct defendant here has effectively admitted, by evading the JavaScript software codes embedded in wickedlocal.com and publicly announcing the market launch of "a community Website for the town of Newton" *after* having received two cease-and-desist letters from plaintiff, that it plans to continue infringing. (Blevins Aff., ¶¶ 4-7; Reibman Aff., ¶13 and Ex. 2; Grygiel Aff., ¶¶ 2, 4 and Exs. 1, 3) Defendant's past infringement coupled with its clear intent to commit future infringement – on or about December 18, 2008, defendant began uploading plaintiff's original news content onto the home page of two more community news websites, www.boston.com/yourtown/needham and www.boston.com/yourtown/waltham (Grygiel Aff., ¶ 6 and Ex. 4) – should entitle plaintiff to an injunction against future unauthorized use of material that cannot yet be registered.

Plaintiff seeks a temporary restraining order and preliminary injunction enjoining and restraining defendant from reproducing, hosting, distributing and displaying its

copyright-protected content to users on the Infringing Website. In a nutshell, plaintiff asks this Court to protect the integrity of its copyrighted content, whether or not currently registered.

## CONCLUSION

Based on the foregoing reasons and as set forth in the accompanying declarations, GateHouse Media Massachusetts I, Inc.'s application for a temporary restraining order and preliminary injunction should be granted in its entirety, together with such other and further relief as the Court may order.

**DATE:** December 22, 2008
Boston, Massachusetts

Respectfully submitted

**HISCOCK & BARCLAY, LLP**

By: Anthony A. Scibelli
Anthony A. Scibelli
(BBO #556507)
Carolyn A. Marcotte
(BBO #663616)
*Attorneys for Plaintiff*
*GateHouse Media Massachusetts I, Inc.*
Office and Post Office Address
50 Federal Street, 5th Floor
Boston, Massachusetts 02110
Telephone: (617) 274-2901

Michael J. Grygiel
(Application for admission
*pro hac vice* pending)
William A. Hurst
(Application for admission
*pro hac vice* pending)

Office and Post Office Address
50 Beaver Street
Albany, New York 12207
Telephone: (518) 429-4234